NUMBER 13-08-00640-CV


COURT OF APPEALS


THIRTEENTH DISTRICT OF TEXAS


CORPUS CHRISTI - EDINBURG 

 


RICHARD G. ROTH, Appellant,


v.


JACLYN L. ROTH, Appellee.

 




On appeal from the County Court at Law No. 1


of Hidalgo County, Texas.

 


MEMORANDUM OPINION


Before Chief Justice Valdez and Justices Yañez and Vela

Memorandum Opinion by Justice Yañez

 This is an appeal from a judgment entered in the divorce of appellant, Richard G.
Roth, from appellee, Jaclyn Roth. By two issues, Richard contends that the trial court
erred in: (1) entering provisions in the final divorce decree that were inconsistent with the
parties' written settlement agreement; and (2) ordering him to pay spousal maintenance
that accrued after the parties signed the settlement agreement. We affirm, in part, reverse
and remand, in part, and dismiss, in part. 

I. Background 


 Jaclyn filed for divorce in March 2007. On July 16, 2008, the parties entered into
a written settlement agreement ("the agreement") pursuant to section 6.604 of the family
code. (1) The agreement, which is slightly longer than two single-spaced typewritten pages,
addresses matters regarding the division of community property, including the disposition
of the Roth Law Firm, P.C., and treatment of 2007 and 2008 income taxes. 

 At a hearing on September 30, 2008, Jaclyn's counsel advised the court that several
"controversies" remained "unresolved" by the agreement and requested that the court rule
on those matters. Specifically, Jaclyn's counsel argued that a $104,262.06 loan to Richard
from the law firm's shareholders was an "account receivable" that was not included in the
agreement because it was "overlooked," and that it should be divided "50/50" between the
parties. Jaclyn's counsel also asked the court to order Richard to continue her health
insurance coverage until she could convert the policy to an individual policy. 

 In response, Richard's counsel argued that the parties negotiated for Jaclyn's share
of the law firm, which was reflected in the agreement as a percentage interest in certain
cases in progress. Thus, Jaclyn's assertion that she was entitled to a share in the "account
receivable" was simply an attempt to add to the agreement by "tack[ing] on" an additional
$50,000. Similarly, Richard's counsel argued that the agreement did not address Jaclyn's
health insurance coverage and the request was "just another example of trying to add
something to the agreement." Richard's counsel argued that the trial court had no authority
to modify or add to the agreement; he urged the trial court to sign a final divorce decree
that incorporated the agreement by reference. 

 The trial court also heard the parties' arguments regarding Jaclyn's motion to
enforce temporary support. On July 11, 2007, the trial court ordered Richard to pay Jaclyn
temporary spousal support in the amount of $7,500 per month. After the parties signed
the agreement on July 16, 2008, Richard failed to pay any spousal support for August and
September 2008. Richard argued that his obligation to pay temporary support terminated
when the parties signed the agreement.

 At the conclusion of the hearing, the trial court: (1) granted the divorce; (2)
approved the July 16, 2008 agreement; (3) declined to divide the $104,262.06 "account
receivable"; (4) declined to order Richard to continue payment for Jaclyn's health
insurance; and (5) ordered Richard to pay Jaclyn spousal support of $3,500 for August and
September. (2) That same day, the trial court signed the final divorce decree, which was 
submitted by Jaclyn's counsel. (3) 

 Richard filed a motion for reconsideration, in which he complained that the final
divorce decree did not conform to the agreement because it "contain[ed] more obligations
by [Richard] and other matters not agreed to regarding property division." The trial court
held a hearing on Richard's motion on October 22, 2008. At the hearing, Richard's counsel
argued that the final divorce decree contained several material differences from the
agreement, the most significant of which concerns the treatment of income taxes for 2007
and 2008. Richard's counsel argued that application of the decree's provisions regarding
income tax and earnings for 2007 and 2008--which award each party credit for half of the
estimated tax payments and withholding tax payments made during the period--would
result in Richard owing approximately $110,000 in additional taxes, while Jaclyn would
receive a net "refund" of approximately $110,000. (4) According to Richard's counsel, the
provisions were "not part of the agreement" and "simply [result in] a redistribution of
income" in Jaclyn's favor. Richard's counsel also argued that the provisions regarding
income taxes in both the agreement and the final decree are inconsistent with the
requirements of the Internal Revenue Code. On October 30, 2008, the court denied
Richard's motion for reconsideration. This appeal ensued.

II. Terms of the Settlement Agreement 


 By his first issue, Richard contends that the divorce decree did not conform to the
agreement because it added terms and conditions regarding: (1) the treatment of income
taxes for 2007 and 2008; and (2) the disposition of the Roth law firm.

A. Applicable Law 

 The agreement states that it is a "written settlement agreement pursuant to Section
6.604 of the Texas Family Code." (5) Section 6.604, which was enacted in 2005, provides:

(a) The parties to a suit for dissolution of a marriage may agree to one or
more informal settlement conferences and may agree that the
settlement conferences may be conducted with or without the
presence of the parties' attorneys, if any.


(b) A written settlement agreement reached at an informal settlement
conference is binding on the parties if the agreement:


 (1) provides, in a prominently displayed statement that is in
boldfaced type or in capital letters or underlined, that the
agreement is not subject to revocation;


 (2) is signed by each party to the agreement; and


 (3) is signed by the party's attorney, if any, who is present at the
time the agreement is signed.


(c) If a written settlement agreement meets the requirements of
Subsection (b), a party is entitled to judgment on the settlement
agreement notwithstanding Rule 11, Texas Rules of Civil Procedure,
or another rule of law.


(d) If the court finds that the terms of the written informal settlement
agreement are just and right, those terms are binding on the court. If
the court approves the agreement, the court may set forth the
agreement in full or incorporate the agreement by reference in the
final decree.


(e) If the court finds that the terms of the written informal settlement
agreement are not just and right, the court may request the parties to
submit a revised agreement or set the case for a contested hearing.[ (6)]


 The agreement in this case met the requirements of section 6.604. A final judgment
rendered upon a settlement agreement must be in strict and literal compliance with the
agreement. (7) Section 6.604(d) provides that if, as here, the trial court approves an
agreement pursuant to this section, it "may set forth the agreement in full or incorporate
the agreement by reference in the final decree." (8) The statute does not authorize a court
to modify an agreement, to resolve ambiguities or otherwise, before incorporating it into a
decree. (9) A trial court's modifications to settlement agreements are grounds for reversal
where the modifications "add terms, significantly alter the original terms, or undermine the
intent of the parties." (10)

B. Analysis 

 By his first sub-issue, Richard argues that the divorce decree contained language
addressing the treatment of withholding and estimated tax payments for the parties' 2007
and 2008 income taxes that (1) was not included in the agreement and (2) resulted in an
unintended windfall of approximately $110,000 to Jaclyn. Paragraph number 6 of the
agreement states:

2007 and 2008 taxes through the date of divorce. The income of the parties
is partitioned per the Texas Family Code. Each party shall pay taxes on their
individual personal earnings/income and on any property or business. Any
refund and/or overpayments for the time period above are to be split 50/50. 
Parties shall file separate returns for the time period above. 


 The divorce decree states, in pertinent part:


 The parties have agreed to partition their income and earnings for the
calendar years 2007 and 2008 through the date of entry of this Final Decree
of Divorce. Pursuant to that agreement, the Court hereby PARTITIONS (and
for the purpose of reporting and determining income tax liability for the years
2007 and 2008), 100% of the parties['] income, gain, loss and deductions
attributable to a party, from property awarded to that party in this agreement,
as his or her sole and separate property as if that party had been single and
unmarried from January 1, 2007 through the date of entry of this Final
Decree of Divorce and each party in filing their respective income tax returns
shall report his or her income consistent with this partition. IT IS FURTHER
ORDERED that for the purposes of determining each party's income tax
liability, any property awarded to a party in this agreement shall be deemed
to have been partitioned to that party and have been that party's separate
property as of January 1, 2007 and thereafter. IT IS FURTHER ORDERED
AND DECREED that each party is awarded and shall use as a credit against
his or her tax liabilities one-half (1/2) of any estimated tax payments or
current or prior year overpayments made during the time period above and
one-half (1/2) of any withholding tax payments. Further, any expenditures
that are tax deductible are assigned to the party who made those payments.


 At the October 22, 2008 hearing on Richard's motion for reconsideration, Jaclyn's
certified public accountant expert, William Bradley, testified that he prepared Jaclyn's
income tax return for 2007. In preparing Jaclyn's return, Bradley credited her with half of
the withholding and estimated payments already made, resulting in a $220,000 refund to
her, which would be shared "50/50" with Richard. On re-cross examination, Bradley
testified as follows: 

Q [Richard's counsel]: And you know that he [Richard] had paid
approximately $440,000 in taxes to cover that
income, correct?


A [Bradley]: He paid $440,000 in taxes, yes, sir.


Q: And the way that you have done this, Mr. Roth
has had taken away from his side of the ledger
$220,000 or half of that $440,000 that he had
paid to the IRS, correct?


[Jaclyn's counsel]: Object to form.


A [Bradley]: It's in the final decree of divorce. 

 

Q [Richard's counsel]: And the result of that, if you assume that the
$440,000 was the appropriate amount to pay, to
cover his tax liability for 2007, he is now going to
have to come up with another $220,000 to pay
the IRS, correct?


[Jaclyn's counsel]: Objection as to speculation.


A [Bradley]: You know, I would have to compute the
numbers. You're also assuming somewhere in
there that he's going to--Mrs. Roth will have to
give him back about 110,000. And I don't know
what his additional taxes he's got to pay.


Q [Richard's counsel]: Well[,] the IRS isn't going to wait for Mrs. Roth to
pay him $110,000. They wanted their money
back on April 15th, correct?


A: At the latest, yeah. 


Q: At the latest?


A: I'm sure he's incurring a penalty as a result of
not paying in April.


Q: And he did pay in April, though, it's just now
retroactively you've taken or Mrs. Roth has taken
$220,000 off of his side of the ledger, correct?


A: Based on the final decree of divorce, which I
followed.


Q: And Mr. Bradley, believe me, I'm not quarrelling
[sic] with you here, I'm just trying to get the facts
out of what happened.


A: Yes, sir.


Q: If--you know from reviewing information that the
$440,000 that Mr. Roth paid during the calendar
year 2007 and then on April 15th was roughly
the amount necessary to cover his tax liability,
correct?


A: Well, I--it probably was. I received
a--somewhere along the road I received from
Mr. Seeman [Richard's CPA] an estimate of '07
taxes and it looks like their joint taxes from '07
was about that.

 

Q: Okay. And so of the 400-- 


A: Of the 400, I'm sorry.


Q: Yeah. And so if he's now been deprived of
$220,000[,] then as far--if you reported it the
way that you reported it, I'm sorry. If Mr.
Seeman tracked the way you were doing it[,] first
of all[,] Mr. Roth just talking taxes[,] not penalties
or interest[,] would have an additional tax liability
of $220,000 approximately?


A: That's probably a reasonable guess.

 

 . . . .

 

Q: Believe me, we understand[,] Mr. Bradley. 
Nobody's going to go to the bank with these
numbers. So the net effect, even if Mr. Roth
eventually gets $110,000 back from Mrs. Roth's
half of her refund, is he still going to be 110,000
plus penalties and interest in the hole?


A: Okay.


Q: Do you agree with that?


[Jaclyn's counsel]: Objection, speculation.


A: That sounds about right.


 The agreement is silent as to the treatment of any estimated or withholding tax
payments made during the relevant time period. Thus, the provisions in the final decree
awarding each party "credit" for half of any estimated and withholding tax payments
improperly added material terms that the parties did not agree to. (11) Accordingly, we
sustain Richard's first sub-issue and need not address his second sub-issue challenging
the decree. (12) 

III. Spousal Maintenance 


 By his second issue, Richard contends the trial court erred in ordering him to pay
spousal maintenance that accrued after the parties signed the settlement agreement. 
Jaclyn argues that we lack jurisdiction over Richard's appeal of the trial court's October 1,
2008 order on Jaclyn's First Amended Motion for Enforcement and Motion for Contempt
because: (1) rulings in contempt proceedings may only be attacked by writ of habeas
corpus, and are not subject to direct appeal; and (2) Richard did not file a timely notice of
appeal from the contempt order.

 Following the September 30 hearing, the trial court signed the final divorce decree
on October 1, 2008. That same day, the trial court signed a contempt order ordering
Richard to pay Jaclyn $15,000 as spousal support arrearage. On November 10, 2008,
Richard filed a notice of appeal, in which he appealed from the final divorce decree signed
on October 1, 2008. On May 22, 2009, Richard filed an amended notice of appeal, in
which he attempted to appeal from "that portion of the October 1, 2009 [sic] Order Granting
Motion to Enforce awarding $15,000.00 to Jaclyn Roth." 

 We do not have jurisdiction to review a contempt order by direct appeal. (13) "This is
so even when the contempt order is being appealed along with a judgment that is
appealable." (14) Accordingly, we dismiss that portion of Richard's appeal challenging the
contempt order. 

IV. Conclusion 


 As to the granting of the divorce, we affirm the trial court's judgment. However, as
to the modification of the agreement, we reverse the trial court's judgment and remand to
the trial court for further proceedings consistent with this opinion. We dismiss that portion
of the appeal challenging the contempt order awarding Jaclyn $15,000 as spousal support
arrearage. 


 


 LINDA REYNA YAÑEZ,

 Justice


Delivered and filed the

30th day of December, 2010.


 
1. See Tex. Fam. Code Ann. § 6.604 (Vernon 2006). "[Section 6.604] provides for the enforcement of
an informal settlement agreement reached between parties, as long as the agreement bears the same
formalities required of an enforceable mediated settlement agreement . . . ." Sampson & Tindall, Tex. Fam.
Code Ann., § 6.604, Comment, p. 83 (2010). 
2. We note that although the trial court ordered Richard to pay spousal maintenance payments of
$3,500.00 for August and September, the record contains a contempt order, signed by the trial court on
October 1, 2008, ordering Richard to pay spousal payments of $7,500.00 for August and September, for a
total of $15,000.00 due to Jaclyn. Apparently, neither party brought this discrepancy to the attention of the
trial court. In Richard's Motion for Reconsideration, filed on October 9, 2008, he did not complain of the
discrepancy or of the trial court's October 1, 2008 order requiring him to pay Jaclyn $15,000.00 in spousal 
support payments. Similarly, at the October 22, 2008 hearing on Richard's Motion for Reconsideration, there
was no mention of the order requiring Richard to pay Jaclyn $15,000.00 for spousal maintenance. 
3. The final divorce decree is twenty double-spaced typewritten pages long. 
4. The decree's provisions and Richard's argument are discussed more fully below. 
5. See Tex. Fam. Code Ann. § 6.604. 
6. Id. 
7. See Chisholm v. Chisholm, 209 S.W.3d 96, 98 (Tex. 2006); In re Marriage of Joyner, 196 S.W.3d
883, 890-91 (Tex. App.-Texarkana 2006, pet. denied) (noting that section 6.602, governing mediated
settlement agreements, does not authorize the trial court to substitute its judgment for a mediated settlement
agreement); see also Loehr v. Loehr, No. 13-08-00380-CV, 2009 Tex. App. LEXIS 6863, at **8-9 (Tex.
App.-Corpus Christi Aug. 28, 2009, no pet.) (mem. op.). 
8. Tex. Fam. Code Ann. § 6.604(d). 
9. See id.; see also Engineer v. Engineer, 187 S.W.3d 625, 626-27 (Tex. App.-Houston [14th Dist.]
2006, no pet.) (holding trial court erred by modifying an ambiguous alimony provision). 
10. Beyers v. Roberts, 199 S.W.3d 354, 362 (Tex. App.-Houston [1st Dist.] 2006, pet. denied). 
11. See Chisholm, 209 S.W.3d at 98.
12. See Engineer, 187 S.W.3d at 626 ("If an appellate court determines that the decree contains terms
and provisions that were never agreed to by the parties, it must reverse the judgment and remand the
cause."). 
13. See Ex parte Williams, 690 S.W.2d 243, 243 n.1 (Tex. 1985); In re Rich, 993 S.W.2d 272, 273
(Tex. App.-San Antonio 1999, no pet.); see also In re K.S.E., No. 04-02-319-CV, 2003 Tex. App. LEXIS 4680,
at *2 (Tex. App.-San Antonio June 4, 2003, no pet.) (mem. op.). 
14. In re Gonzalez, 993 S.W.2d 147, 157 (Tex. App.-San Antonio 1999, no pet.).